**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

DEAN A. HOSKINS,

        Plaintiff,

vs.

SNAP-ON INCORPORATED
RETIREMENT PLAN,

        Defendant.

No. C08-3069-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING ACTION FOR
REVIEW OF ERISA BENEFITS
DETERMINATION**

_____

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      *1.*   *Hoskins's medical condition and termination* . . . . . . . . . . . 2
      *2.*   *Plan documents* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      *3.*   *Request and denial of disability retirement income benefits* . . . 6
      *4.*   *Requests for plan documents* . . . . . . . . . . . . . . . . . . . . . 18
   *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
   *A. Denial of Benefits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      *1.*   *Authority for a civil action* . . . . . . . . . . . . . . . . . . . . 19
      *2.*   *Standard of review* . . . . . . . . . . . . . . . . . . . . . . . . . 20
          *a.*   **Arguments of the parties** . . . . . . . . . . . . . . . . . . 20
             *i.*   **Hoskins's initial arguments** . . . . . . . . . . . . . 20
             *ii.*   **The Plan's response** . . . . . . . . . . . . . . . . . 21
             *iii.*   **Hoskins's reply** . . . . . . . . . . . . . . . . . . . 23
          *b.*   **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      *3.*   *Entitlement to disability benefits* . . . . . . . . . . . . . . . . . 27
          *a.*   **Arguments of the parties** . . . . . . . . . . . . . . . . . . 27
             *i.*   **Hoskins's initial arguments** . . . . . . . . . . . . . 27

    ii.  *The Plan's response* . . . . . . . . . . . . . . . . . . . 28
    iii.  *Hoskins's reply* . . . . . . . . . . . . . . . . . . . . . . 29
   **b.**  **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
 **B. Failure to Provide Plan Documents** . . . . . . . . . . . . . . . . . . . . . . . 42
   **1.**  **Arguments of the parties** . . . . . . . . . . . . . . . . . 42
    **a.**  **Hoskins's initial arguments** . . . . . . . . . . . . . . 42
    **b.**  **The Plan's response** . . . . . . . . . . . . . . . . . . . 43
    **c.**  **Hoskins's reply** . . . . . . . . . . . . . . . . . . . . . . 43
   **2.**  **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## I. INTRODUCTION

### A. Factual Background

#### 1. Hoskins's medical condition and termination

Plaintiff Dean Hoskins is a fifty-seven year old former employee of Snap-On, Incorporated ("Snap-On") at its Algona, Iowa plant. Snap-On hired Hoskins on December 13, 1976, as an engineer. When Hoskins's employment with Snap-On ended, he was working in the position of manufacturing engineer. His duties included purchasing, building, and installing major machine projects.

Hoskins had long history of medical problems while at Snap-On. In 1979, Bruce Gantz, M.D., with the University of Iowa Hospitals and Clinics Department of Otolaryngology—Head and Neck Surgery, diagnosed Hoskins with a right side acoustic neuroma. The tumor was excised in 1980, which rendered Hoskins deaf on his right side. In 1990, Hoskins experienced a sudden change in hearing on his left side, due to another

tumor.  Eventually, Hoskins was diagnosed with neurofibromatosis, Type 2.[1]  Dr. Gantz decided to watch the left side tumor, rather than operate, because it was Hoskins's only hearing ear.  Dr. Gantz opined, again in 2003, that "the only avenue [to Hoskins] at th[e] time is watchful waiting and rechecking [his] hearing and the growth of the tumor."  R. at 252.

Hoskins kept Snap-On informed of his condition.  In fact, in January of 2005, Hoskins informed Snap-On that he had made an additional appointment with Dr. Gantz, for March 23, 2005, to start the process for removal of the left side tumor.  In the letter, Hoskins states:  " . . . I fully recognize that this surgery could cost me my total hearing, my remaining balance function, my facial function, or even my life.  It can also save my remaining hearing, and further, vocal communication, which is so vital to me as an engineer."  R. at 255.

Hoskins also notified Snap-On, after he was removed from his private office and put in an open bullpen, about the problems he was having at work—that he could not hear the telephone nor conduct conversations with coworkers.  Hoskins informed his manager at the time, Lee Gunderson, of his concern with the bullpen environment, in relation to his hearing problems.  The record reflects, that Hoskins alleged, that on March 29-30, 2005, he attended a work event where he was unable to hear anything and had to have captions added to video clips in order to understand them.  Gunderson observed that Hoskins's hearing problems caused him difficulties in his job during the summer of 2005.

---

[1]  Neurofibromatosis, Type 2, "consists primarily of bilateral (less often, unilateral) acoustic neuromas, causing deafness, often accompanied by other intracranial and paraspinal neoplasms, such as meningiomas and gliomas.  Type 2 . . . also has autosomal dominant inheritance, but the gene locus is on 22q11, caused by mutation in the NF2 gene encoding the product merlin."  Stedman's Medical Dictionary 1209 (27th ed. 2000).

The record reflects that Hoskins has alleged that, by July 25, 2005, his balance had deteriorated to the point where he would spend so much time at his desk that he received criticism from the plant manager. This was in contrast to the many years where he would spend entire days on the floor. During a work event on August 25, 2005, Hoskins claimed, in the record, that his balance disorientation was so great that he had to leave twice to vomit in the restroom. Hoskins alleged that most of the Algona workforce knew of his condition, including Kari Lowe, who Hoskins discussed his attacks with, and Duane Walker, who physically assisted Hoskins on many projects. Hoskins also claimed, in the record, that he missed work on approximately fifteen occasions between January and October of 2005, due to his condition.

Hoskins was terminated, on October 19, 2005, as part of a so-called reduction in force ("RIF"). The record contains Hoskins's termination letter, which states in part:

> This will confirm your termination from Snap-On . . . effective 10/19/2005, due to a reduction in force. Because you are at least age 50 and have ten or more years of service with Snap-On, this is also classified as a Retirement. Although your last workday is 10/19/2005, your 10.5 days of vacation extend your last day of employment to 11/3/2005. Please note that this is the known number of vacation days that you have not taken up to the time that this letter is written. If you do take any vacation days between the date of this letter and your termination, such days will be deducted from the figure above.
> . . .
> As a terminating employee, all Life, Accidental Death and Dismemberment, Disability and Health Benefit coverage[]s provided by Snap-on Incorporated will end on 11/3/2005.

R. at 1001-1002. At Hoskins's RIF conference with his manager, Gunderson, Hoskins indicated that he would be pursuing disability retirement.

## 2.    *Plan documents*

While at Snap-On, Hoskins was covered by Defendant Snap-On Incorporated Retirement Plan ("Plan"), an ERISA plan, *see* 29 U.S.C. § 1002(2).  The Plan documents provide for disability retirement income benefits in Article III, Section 7.  Subsection 7.1 states:

> 7.1    Eligibility.  A member who, after completing ten or more years of continuous employment, becomes totally and permanently disabled by bodily injury or disease which prevents him from engaging in any occupation for remuneration profit, determined in the sole discretion of the committee ("disabled"), continues so disabled for six consecutive months and, in the opinion of the committee, is likely to remain so disabled for the balance of his life, will be retired and will receive a disability retirement income . . . .

R. at 97.  Subsection 7.2 explains that the committee will require medical proof that the member was disabled under subsection 7.1.  *Id.*  Subsection 2.4 explains who is a "member" under the Plan documents:

> 2.4    Members.  A member is an "active member" of the SIRP[2] plan component if he is employed by an employer (as defined in subsection 1.4) and is accruing benefits under the SIRP plan component (and not another component of the plan, as defined in subsection 1.3); provided, however, that a member shall be considered an active member of the SIRP plan component on the date on which such member terminates employment with all of the employers and subsidiaries.  Any former member of the SIRP plan component who has accrued benefits (which have not been paid to, or for the benefit of, the

_____

[2]    The "SIRP plan" refers to the plan documents in effect prior to the current Plan documents.  *See* R. at 30 ("The plan is an amendment and restatement and continuation of (i) the second restated plan as amended and in effect on December 31, 2000 ("SIRP plan"). . . .")

member or transferred to another qualified plan or IRA) but who is no longer accruing benefits as an active member of the SIRP plan component will be considered an "inactive member" whose accrued benefits will be paid in accordance with the provisions of the SIRP plan component in effect upon his termination of employment, retirement, or death, as the case may be. For all plan purposes, "member" and "members" shall refer to active members and to inactive members, collectively, except that where it is necessary to distinguish between them, as specific referral shall be made.

R. at 73-74. The Plan documents, subsection 3.4, defines the disability retirement date:

3.4 <u>Disability Retirement Date.</u> The "disability retirement date" for a member is the first day of the month coincident with or next following the date he is retired because of total and permanent disability in accordance with Section 7. A member must have completed ten or more years of continuous employment to be eligible for a disability retirement income.

R. at 75.

### 3. *Request and denial of disability retirement income benefits*

On October 24, 2005, five days after his October 19, 2005, RIF conference, Hoskins applied for disability retirement benefits. In his application, Hoskins listed his sickness or injury as Neurofibromatosis, Type 2, and stated that Dr. Gantz was his doctor. In response to Hoskins's application, Bridget Bord, the Plan's Senior Benefit Analyst, contacted Hoskins with a request for additional information, including information from his physician, labeled Part C, in her October 25, 2005, letter. As an attachment to Hoskins's October 29, 2005, letter, he provided the information Bord requested, as enclosures, and alleged that Dr. Gantz completed Part C without consultation with him. Hoskins also alleged that he wanted, but was unable, to meet with Dr. Gantz.

Dr. Gantz had completed Part C, noting a diagnosis of Hoskins's condition as Neurofibromatosis. Dr. Gantz also indicated Hoskins was not totally disabled but noted that Hoskins had "retrogressed" and suffered from: "Moderate to severe sensorineural hearing loss (AS). Profound deafness (AD). Hearing handicap is 52.6% on 10/28/2005, which makes it difficult for him to hear in a noisy environment. His hearing might continue to deteriorate." R. at 265. The form also provided that Dr. Gantz last examined Hoskins on March 23, 2005, but that an audiogram had been performed on him October 28, 2005. On November 1, 2005, Bord recommended denying Hoskins's request for benefits, explaining that: "Based on Physician's notes [the employee] is NOT disabled from his own [occupation] or all [occupations]. Recommend denial of disability retirement." R. at 270 (emphasis in original). The recommendation was approved by Jacqueline A. Williams on November 3, 2005. The Plan denied Hoskins's application for disability retirement benefits on November 4, 2005.

Hoskins received notice of the Plan's denial of his benefits through a letter dated November 8, 2005. The grounds for denying Hoskins request were as follows:

> Under the terms of the Snap-on Incorporated Retirement Plan for Hourly Employees, an individual must be permanently and totally disabled in order to qualify for disability retirement benefits. As identified on Page RET 4 of the Retirement Plan document, an individual qualifies for a disability pension six months after they have to stop work because of a permanent and total disability that will continue to prevent them from engaging in any occupation for wage or profit.
>
> Based on information we have received from your physician Dr. Gantz, you are not considered disabled from your regular occupation. In addition, your physician does not indicate that your condition is permanent, and has indicated an indefinite

return to work date. Therefore, Disability Pension Benefits are unavailable.

R. at 275. The letter also states, concerning Hoskins's right to appeal:

> As indicated on RET-13 of your retirement booklet, you have the right to appeal a claim denial. Your written request must contain a statement of reasons for the appeal, reference to the specific provisions in the plan document on which the appeal is based, the reasons why you feel the claim should be granted and the evidence supporting each reason, and any other relevant documents or comments you wish to submit to support your appeal.
>
> A decision on your appeal will generally be made within 60 days, and a written decision will be sent to you.

*Id.*

Hoskins appealed the Plan's denial of disability retirement benefits on November 19, 2005. His appeal form stated:

> The letter of denial indicates that I am covered under the hourly employee plan. Note that I was the salaried Sr. Mfg. Engineer for the Algona plant for 29 years. . . . I was released from my job on 11/3/2005, as team activity became ever more difficult. I have a brain tumor and profound deafness [and] balance problems. I can no longer perform the verbal communication needed to work as a manuf[acturing] engineer, as evidenced by my release. These tumors never quit growing and neurofibromatosis is not curable. It is due [to] damaged chromosomes, and can cause tumors on all organs of body, particularly [the] spine [and] brain, this is my third tumor I now have. . . .

R. at 1016.

Paul Prickett, Director of Corporate Benefits, denied Hoskins's appeal on behalf of the Benefits Committee in a letter dated December 13, 2005. After repeating the Section

7.1 eligibility requirements, the letter provided the following grounds for denying Hoskins's appeal:

> Based on information received from your doctor, while you do have a hearing loss, you are not totally disabled from any occupation. On that basis, you are not considered totally and permanently disabled as defined above and disability pension benefits are unavailable.

R. at 1017. Following this denial, Hoskins emailed two requests for reconsideration to Prickett, on January 2, 2006, and February 16, 2006. Hoskins also sent a letter to Bord dated January 12, 2006, asking for reconsideration of his appeal. R. at 287.

Hoskins also provided a letter to Bord, dated March 12, 2006, which included an email and "updated Retirement Plan Appeal Form." The Retirement Plan Appeal Form states:

> Condition at termination—Neurofibromatosis type 2. This disease is permanent and no cure exists. It creates tumors throughout the body. Tumors on, and loss of, both hearing and balance nerves is guaranteed. I have no balance nerves or hearing nerves on right side and have lost balance and most hearing on left side. Some face control still exists. I have a brain tumor that is not operable, according to Iowa City medical school[']s head doctor. I have another visit on March 29th scheduled to assess tumor growth. Working is no longer possible.

R. at 1019.

On March 30, 2006, Dr. Gantz wrote a letter to Bord, which attempted to clarify his previous opinion. Dr. Gantz wrote:

> Mr. Dean Hoskins . . . has been a patient at the University of Iowa since 1979. Mr. Hoskins has a diagnosis of neurofibromatosis. He had his acoustic tumor removed on the

right side in 1979 and, unfortunately, his hearing was also lost during that procedure on the right side.

Mr. Hoskins is followed now for a 2nd tumor on the left side on his balance and hearing nerve. He continues to maintain his hearing, but it is gradually worsening. His word understanding today is only 78%, when it was . . . , a year ago, up in the high [of] 90% word understanding and his pure tones continue to deteriorate. Because of this tumor, Mr. Hoskins has difficulty with his balance and he should be disabled from his regular occupation, because of the danger of falling and losing his balance around equipment. His balance will most likely stabilize in the future, but we might have to remove the tumor on the left as it enlarges, because it is starting to press on the brainstem. We will not remove it as long as he has some useful hearing in that ear, but we might be forced, if the tumor grows.

I am sorry that you got the impression that this is not a permanent situation. It is a permanent condition and it is unlikely Mr. Hoskins will be able to return to work and I would claim that he is totally disabled and should have the ability to participate in his disability pension[']s benefit.

I am hopeful that this letter will help to clarify Mr. Hoskins's unfortunate situation. It is unlikely that he will be employable, due to his disease and disorder.

R. at 1021 (emphasis omitted).

On May 1, 2006, Hoskins wrote an additional letter to Bord. In this letter, he restated the arguments he had made in support of his request for disability retirement benefits and summarized some of the correspondence he had with the Plan regarding his request.

On May 26, 2006, a representative from the Employee Benefits Security Administration ("EBSA") contacted Prickett concerning Hoskins's case. Prickett informed the EBSA representative of the two issues he believed were present in this case:

> 1) documentation from the physician does not indicate permanent and total disability, as required in Sec. 7; [and] 2) employment terminated before application for disability retirement—one must be disabled from active employment for a minimum of six months before one can apply for a disability retirement, in this case employment terminated and then application was made for the disability retirement.

R. at 1034. Prickett also stated that a determination that Hoskins was entitled to Social Security Disability benefits[3] was not relevant to whether he was disabled under Section 7, because:

> 1) the definition of disability under Social Security is not permanent and total disability as required by the Plan; and 2) he was not disabled from active employment for six months.

R. at 1034.

Prickett finally provided a response to Hoskins's requests and letters in writing, on August 14, 2006.[4] Prickett wrote:

> First, let me say I am deeply sorry that your prior correspondence has gone unanswered. I apologize if there has been some misunderstanding relative to the status of your application for disability pension and the subsequent appeal.

---

[3] On May 26, 2006, an Administrative Law Judge found that Hoskins was disabled as of October 19, 2005, under the Social Security Act. Hoskins provided the Social Security decision to Prickett on June 20, 2006, along with a letter that provided many of Hoskins's arguments in support of his request for disability benefits.

[4] Hoskins had also been corresponding with Gunderson, his former supervisor, requesting that Gunderson be an advocate for Hoskins.

I want to take this opportunity to respond to your inquiries and offer my assistance to make sure you understand the status and how the decisions were arrived at. Again, I apologize if the prior communications weren't crystal clear.

First, as we discussed when you first called me (October 24, 2005) prior to submitting your application, I told you it was very unlikely you could be determined to be disabled if you weren't actively at work—recall you told me you had just been let go.

*      Requested application for Disability Pension on October 24, 2005; form was faxed to the receptionist at the Algona Plant at your request
*      Application for disability pension was dated October 29, 2005; received in Corporate Benefits on October 31, 2005
*      Last day of work was October 19, 2005
*      Official termination/retirement date was November 3, 2005; this date represents the unused vacation through October 19

Dean, the fact of the matter is that the pension plan includes a provision for disability benefits for employees who stop working because of the disability. You clearly did not stop working because of your disability, you stopped working because your employment terminated; you then applied for disability. Further, the plan requires a participant to have been off of work for six months due to the disability before benefits can begin. Again, your employment terminated prior to any period of disability.

Second, the pension plan's disability provisions call for total permanent disability.

*      Based on the Doctor's statement from Dr. Gantz supplied with your application, you were not totally and permanently disabled when he signed the statement on October 28, 2005.

      \*      Dr. Gantz checked the "No" box for the question "Is patient now totally disabled"

      \*      Dr. Gantz wrote in the "Confined to House or Hospital" section that you were not confined to either and "Not Restricted" to the question "What form of activities should the patient be able to do?"

Thus, based on the Dr.'s statement, you were not totally and permanently disabled.

Third, you filed an Appeal on November 19, 2005 to have your claim reconsidered. That appeal was considered on November 29, 2005 and a denial letter was sent to you on December 13, 2005.

      \*      The appeal was denied as no additional medical evidence or summary of medical evidence from a physician was provided. Thus, the committee had no new information to consider and determined that the claim was correctly considered upon original application.

      \*      The plan provides that decisions of the appeal committee are final and binding, unless the committee is presented with evidence showing that a decision was based upon "misstatement or mistake in fact."

      \*      Federal [law] provides that once an appeal has been denied, the participant's next course of action would be to file a lawsuit in federal court.

The additional information you provided may indicate that you have a total and permanent disability, however, the fact of the matter is that you were not totally and permanently disabled prior to your last day worked—if you were, you would not have been at work.

R. at 1036-7.

On August 23, 2006, Dr. Gantz provided Prickett with an additional letter, stating:

> Mr. Hoskins has a diagnosis of neurofibromatosis II. In 1979, he had a translabyrinthine excision of a right acoustic neuroma. This resulted in profound deafness on the right ear and loss of his balance nerve, because the tumor was involving the balance and hearing nerves. He has done well with his remaining tumor in his left ear until recently. We have been following him since his original tumor resection and have watched this tumor slowly grow, but have not elected to operate on it because it was his only hearing ear.
>
> In [March] 2005, he still had 88% word understanding in his left ear and a slowly growing tumor. We saw him again in March 2006 and he was having many more problems related to his tumor. He was having imbalance and unsteadiness and fluctuating hearing. When I wrote to Bridget Bord at Snap-on Incorporated on March 30, 2006, I said th[at] Mr. Hoskins was having more difficulty with his balance and should be disabled because of his balance problems; it had nothing to do with the hearing. In March 2005, his balance was not an issue.
>
> I hope this clarifies the situation and you will provide Mr. Hoskins with a permanent disability. Neurofibromatosis is an extremely devastating disease. It is unfortunate that he has this problem. However, at this point, he is unable to work because of loss of balance function in both ears.

R. at 1038. Hoskins also responded to Prickett's letter, on August 26, 2006, and contested many of Prickett's claims.

On September 7, 2006, Prickett responded to Hoskins's August 26, 2006, letter, and stated that the Appeals Committee had agreed to reconsider Hoskins's November 19, 2005, appeal. R. at 1041-2. Prickett explained that the basis of this reconsideration was the additional medical evidence Hoskins provided to the committee. Hoskins was given

until September 30, 2006, to provide any additional medical information or information in support of his claim that the committee's interpretation of Section 7 was incorrect. Hoskins provided a packet of information in response to this request.

On October 12, 2006, Prickett made an additional request, to Hoskins, for information. The letter explained, in part:

> We (not the Appeals Committee, but myself and the Manager of Health & Welfare Plans and the Manager of Retirement Plans) have reviewed the documentation you sent to determine if, in our opinion, you have supplied information sufficient to support a favorable determination of your appeal.
>
> We believe there is sufficient information to substantiate a Total and Permanent Disability but there is not sufficient information to determine when the Disability presented itself to the degree that it prevented you from working.
>
> We believe that the Appeals Committee may grant your appeal if you can supply substantiation:
> 1. that you notified the Company that you could no longer work because of the disability prior to October 20, 2005 (our records show your last day of work at the plant was October 19, 2005), and,
> 2. of the date, or approximate date, that the Disability prevented you from working.

R. at 1043.

On October 15, 2006, Hoskins responded to Prickett's letter. Hoskins agreed that he would seek additional information from Dr. Gantz but was concerned that Dr. Gantz would not be able to reply by the October 18, 2006, meeting. On October 25, Prickett emailed Hoskins and informed him that the appeal would, instead, be reconsidered at the November meeting.

On November 1, 2006, Dr. Gantz drafted an additional letter in response to this latest request. The letter states, in part:

> A review of a disability form that was signed by me on October 27, 2005 I stated that Mr. Hoskins was not disabled. However that was, I think, based on his hearing handicap, rather than his balance problems.
>
> I would like to change my position on his disability back to October 27, 2005 and state that he was disabled, from a balance point of view, at that time.
>
> I hope this resolves this issue and I hope that Mr. Hoskins can obtain the disability that he is entitled. It is an unfortunate situation that he had no control over. This is a disorder of unknown etiology, but it can be quite devastating and cause severe balance problems and bilateral deafness. I am certain that eventually Mr. Hoskins will lose all the hearing in his only hearing ear and will require a brainstem implant for him to hear in the future.
>
> If I can be of other assistance, please contact me.

R. at 1052.

On January 5, 2007, Prickett sent Hoskins a letter explaining the Benefits Committee's ultimate denial of his request for reconsideration of disability retirement benefits. R. at 1063-5. The letter states, in part:

> The Committee reviewed all of the documents and has rendered its decision to uphold the denial of disability retirement benefits because the original application was properly considered under the terms of the Plan, and, none of the information provided through November 7, 2006 supports a position that you were totally and permanently disabled prior to your termination of employment on October 19, 2005.

Specifically:

> 1. This information provided by Dr. Gantz in his letter of November 1, 2006 does not say that you were totally and permanently disabled as of October 28, 2005. While Dr. Gantz recants his original position that you were not disabled ("because of his hearing handicap"), his revised position that you were disabled, "from a balance point of view", does not clearly identify that you were totally and permanently disabled, as required by the Plan.
>
> 2. There is no evidence suggesting you were totally and permanently disabled, to the extent that a disability prevented you from working, prior to the termination of employment discussion you had with plant management on October 19, 2005. You have not supplied any evidence that you contacted plant management, or any other Snap-on representative, to say that your disability prevented you from working, in fact, you continued to come to work regularly until the termination meeting on October 19, 2005. The fact that you continued to come to work must be interpreted to mean that you were not "totally and permanently disabled by bodily injury or disease which prevents him from engaging in any occupation." In other words, the Committee determined that it was your termination of employment on October 19, 2005 that prevented you from working after October 18, 2005, not disability.

Based on the foregoing the Benefits Committee has determined that the original denial of disability retirement benefits is upheld. The plan provides that Snap-on Incorporated has discretionary authority to construe and interpret the terms of the plan. This is a final and binding decision on the part of Snap-on Incorporated.

R. at 1064-5.

### 4.    *Requests for plan documents*

"At the time of his termination of employment, Hoskins was provided with a copy of the Summary Plan Description ("SPD") for the disability retirement plan." Docket no. 24 (Stipulation of Facts Not in Dispute). "At no time prior to the rendering of the final decision denying his request for benefits did Hoskins make any demand for copies of the Plan documents." *Id.* "In May of 2006, in response to an inquiry from a U.S. Department of Labor ("DOL") representative, the Plan provided copies of the SPD and the Plan description to the DOL." *Id.* "Those documents in turn were provided to Hoskins by the DOL." *Id.*

"On March 8, 2007, counsel for Hoskins made a demand for nine categories of documents including Plan documents," *id.*—this was prior to Hoskins filing his Complaint (docket no. 2), which was filed on December 16, 2008. "A follow-up request was made on April 9, 2007[5]." *Id.* "On April 27, 2007, Prickett left a voice mail for counsel refusing to respond based upon the fact that the appeal process had been exhausted." *Id.* However, Prickett's January 5, 2007, letter had stated, "You are entitled to receive, upon request and free of charge, reasonable access to and copies of, all documents, records, and other information available to the Plan or the Committee that is relevant to your claim." R. at 1065. "Snap-On provided Hoskins a copy of the SP[D] and Plan description in the course of this litigation on April 9, 2009." Docket no. 24.

---

[5]    The record contains an additional follow up request on April 20, 2007. R. at 1066.

## B. Procedural Background

On December 16, 2008, Hoskins filed his Complaint (docket no. 2) with this court. In his Complaint, Hoskins brought a claim for disability benefits under the Plan documents pursuant to 29 U.S.C. § 1132(a)(1)(B), Count I—Claim for Benefits. Hoskins also brought a claim for failing to provide Plan documents, pursuant to 29 U.S.C. §§ 1024(b)(4) and 1132©, Count II—Failure to Provide Information. The Plan filed its Answer on January 16, 2009. The Plan admitted that it was subject to the provisions of ERISA but denied that Hoskins is entitled to disability benefits. The Plan also denied that it violated ERISA by failing to provide Plan documents, claiming that Hoskins was in possession of the information prior to his attorney's requests. The Plan also alleges two affirmative defenses: 1) that Hoskins's Complaint fails to state a claim upon which relief can be granted; and 2) that the Plan is entitled to a deferential review of its decision and applying such a standard demonstrates no abuse of discretion.

On November 23, 2009, Hoskins filed his opening brief (docket no. 22). The parties filed their Stipulation of Facts not in Dispute (docket no. 24) on December 8, 2009. On December 30, 2009, the Plan filed its Brief in Support of Position (docket no. 25). Finally, on February 15, 2010, Hoskins filed his Reply Brief (docket no. 27).

## II. LEGAL ANALYSIS

### A. Denial of Benefits

#### 1. Authority for a civil action

Hoskins's first claim, pursuant to 29 U.S.C. § 1132(a)(1)(B), is that the Plan improperly denied him benefits under the Plan documents, while the Plan argues that the denial was proper. The United States Supreme Court has explained that, ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal

court." *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2346 (2008) (citing 88 Stat. 29, as amended, 29 U.S.C. § 1001 *et seq.*; *see* § 1132(a)(1)(B)).

## 2.     *Standard of review*

### a.     *Arguments of the parties*

***i.     Hoskins's initial arguments****.* Hoskins claims that the court should apply a standard of review that is less deferential than an abuse of discretion standard. Although Hoskins recognizes that the court ordinarily reviews the administrator's decision for abuse of discretion, he claims that the existence of serious and significant procedural irregularities requires the court to give less deference to the Plan's decision to deny benefits.

The first procedural irregularity that Hoskins alleges is the Plan's failure to provide him with the requisite amount of time in which to appeal its denial of benefits. Hoskins claims that he was entitled to 180 days after the Plan's "adverse benefit determination" to file an administrative appeal. Docket no. 22 (citing 29 C.F.R. §§ 2650.503-1(h)(3)(i), (h)(4)). However, Hoskins notes that the Plan only provided him with 60 days to appeal, in its November 4, 2005, denial of benefits. Hoskins claims that he was "extremely" prejudiced by only having 60 days to appeal because he panicked and immediately filed an appeal, without having had time to obtain an examination by his treating physician. In addition, Hoskins claims that his panicking caused him to fail to consult with an attorney.

Second, Hoskins argues that the Plan improperly failed to contact his treating physician, Dr. Gantz, even though it was aware that he was Hoskins's treating physician. Hoskins implies that the Plan should have consulted with Dr. Gantz, because he did not have an opportunity to examine Hoskins. *See* docket no. 22 ("Although [Hoskins] had identified his treating physician as Dr. Bruce Gantz and informed the Plan of his inability to have Dr. Gantz personally examine him prior to submitting his initial medical evidence

20

of his disability, at no time did the Plan contact Dr. Gantz to review [Hoskins's] medical file or to discuss with Dr. Gantz, [Hoskins's] medical situation.") (citations to record omitted).  Hoskins also faults the Plan for failing to ask Dr. Gantz for Hoskins's medical file.  Hoskins further claims that the Plan ignored Dr. Gantz's subsequent opinion that Hoskins was totally and permanently disabled.  Hoskins claims that the Plan's denial of disability retirement benefits is entitled to *de novo* review, because of its failure to consider the additional medical evidence.  Docket no. 22 (citing *Seman v. FMC Corp. Ret. Plan for Hourly Employees*, 334 F.3d 728, 733 (8th Cir. 2003)).

Third, Hoskins alleges that the Plan's stated reasons for denying him benefits have varied and are inconsistent and that some of the stated reasons are impermissibly outside the scope of the Plan documents.  According to Hoskins, the Plan has many reasons for denying him benefits, which amount to the following:  he is not disabled from his regular occupation; his condition is not permanent; he is not totally disabled from any occupation; he is not permanently and totally disabled; his employment was terminated before application for disability retirement; he was not disabled per the Plan document's definition; he did not stop working because of the disability; and he was not totally disabled prior to the last day he worked.  Hoskins claims that none of these reasons are legitimate, as he only needs to show that he was totally and permanently disabled and that it prevented him from engaging in any occupation.

For these reasons, Hoskins claims that he is entitled to *de novo* review, or at least a standard of review that is less deferential than the abuse of discretion standard.

*ii.*      ***The Plan's response***.  The Plan claims that its decision to deny benefits should be reviewed based on an abuse of discretion standard.  Although the Plan recognizes that a standard of review other than abuse of discretion could be applied if there

were serious procedural irregularities, the Plan claims that there were no such irregularities.

First, the Plan alleges that it gave the proper time for appeal. The Plan argues that the 180 days for an appeal under 29 C.F.R. §§ 2650.503-1(h)(3)(i), 2650.503-1(h)(4) applies to group health care plans, while only 60 days are required for retirement plans under 29 C.F.R. § 2560.503-1(h)(2)(i). Nevertheless, the Plan claims, as a practical matter, that Hoskins filed his appeal within days of his receipt of the denial of benefits. As a result, the Plan claims that Hoskins was not prejudiced. In addition, the Plan alleges that Hoskins was given ample time to provide additional information, used this time to provide additional information, and had ample time to hire an attorney.

The Plan also claims that it was under no obligation to contact Dr. Gantz, because it did not rely on contrary medical evidence from its own designated physician. The Plan argues that Hoskins's physician found him not to be disabled, in the initial report, and Dr. Gantz's later attempts, to clarify his position, were unclear. Specifically, the Plan claims that Dr. Gantz's opinion that Hoskins was unable to perform "his" regular occupation suggests something other than the Plan standard and that Dr. Gantz's final opinion that Hoskins was "disabled from a balance point of view" also does not meet the Plan standard. Docket no. 25. The Plan repeats that it did not blatantly ignore Dr. Gantz's opinion, because it was Hoskins who submitted a medical opinion that unequivocally indicated he was not disabled. The Plan also claims that the *Seman* case is distinguishable, because the review panel in that case never acted on the additional medical evidence the claimant submitted after his original denial.

Lastly, the Plan claims that its reasons for denying Hoskins's claim for disability retirement benefits were not inconsistent. Although there were multiple reasons for denying benefits, the Plan claims that Prickett informed Hoskins five days after his

termination that he would likely not get benefits due to the timing of his termination. In addition, the claim analyst did not provide a detailed set of reasons for initially denying Hoskins's request for benefits, according to the Plan, because Dr. Gantz had stated that Hoskins was not disabled. The Plan also appears to argue that there is no difference between filing for disability retirement benefits after being notified of a RIF termination, but prior to one's last day of employment, and asking for retirement benefits six years after retiring. *See* docket no. 25 ("Had plaintiff retired and six years later became disabled, he is not entitled to benefits. Virtually, every 'retiree,' assuming they live long enough, becomes disabled from gainful employment."); *id.* ("Does plaintiff seriously believe that disability benefits are payable to former employees or retirees?").

    *iii.*     ***Hoskins's reply***. Hoskins argues that the Plan's claim, that it considered Dr. Gantz's subsequent opinions in making its final decision, is inconsistent with its reliance on Dr. Gantz's initial opinion that Hoskins was not disabled. Hoskins claims that, because of Dr. Gantz's subsequent opinions, the Plan's reliance on the initial opinion was improper and constitutes a procedural irregularity, which was prejudicial to Hoskins. Hoskins also reiterates many of his arguments concerning the Plan's allegedly inconsistent reasons for its denial of disability retirement benefits.

    ***b.***     ***Analysis***

    The Plan, Section 7, states that eligibility will be determined "in the sole discretion of the committee. . . ." R. at 97. The Eighth Circuit Court of Appeals has explained:

> When a plan reserves "discretionary power to construe uncertain terms or to make eligibility determinations . . . the administrator's decision is reviewed only for 'abuse . . . of his discretion'" by the district court. *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir.2005) (en banc) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)); *see*

> also Conkright v. Frommert, [130 S.Ct. 1640 (2010)]
> (following Firestone and noting that Firestone established a
> "broad standard of deference without any suggestion that the
> standard was susceptible to ad hoc exceptions"). Under the
> abuse of discretion standard, the court must affirm the plan
> administrator's interpretation of the plan unless it is arbitrary
> and capricious. Midgett v. Wash. Group Int'l Long Term
> Disability Plan, 561 F.3d 887, 896-97 (8th Cir. 2009).
> * * *
> However, this standard does not apply if the plan administrator
> has committed "a serious procedural irregularity" causing "a
> serious breach of the plan administrator's fiduciary duty to the
> claimant," in which case the court applies a less deferential
> standard of review. Pralutsky v. Metro. Life Ins. Co., 435
> F.3d 833, 837 (8th Cir. 2006) (internal citations omitted).

Manning v. American Republic Ins. Co., 604 F.3d 1030, 1038 (8th Cir. 2010); see also

Menz v. Procter & Gamble Health Care Plan, 520 F.3d 865, 869 (8th Cir. 2008) ("[E]ven

where the administrator has discretionary authority, a less deferential standard of review

may be warranted if a plaintiff shows that a 'serious procedural irregularity existed' which

caused a 'serious breach of the plan trustee's fiduciary duty to the plan beneficiary.'")

(citing Buttram v. Cent. States, Se. & Sw. Areas Health & Welfare Fund, 76 F.3d 896,

900 (8th Cir.1996)). "A less deferential standard is only warranted when a beneficiary

shows that the plan administrator, 'in the exercise of its power, acted dishonestly, acted

from an improper motive, or failed to use judgment in reaching its decision.'" Menz, 520

F.3d at 869 (citing Neumann v. AT & T Commc'ns, Inc., 376 F.3d 773, 781 (8th

Cir.2004)). In addition, the irregularity "must have some connection to the substantive

decision reached . . . ." Id. (citing Buttram, 76 F.3d at 901); see also Buttram, 76 F.3d

at 901 ("It is important to remember that it is not the existence of procedural irregularities

per se that will cause a court to employ a heightened standard of review when evaluating

a plan administrator's decision. Rather, those irregularities must have some connection to the substantive decision reached. . . .").

Hoskins alleges multiple procedural irregularities: 1) The Plan's failure to provide him with the requisite amount of time to appeal its denial of benefits; 2) The Plan's failure to contact Dr. Gantz and review Hoskins's medical file; and 3) The Plan's inconsistent and improper reasons for denying Hoskins benefits.

Hoskins claims that the Plan provided the incorrect period of time for an appeal and that he panicked in response to the 60 day appeal deadline—this panicking allegedly led to the submission of a medical opinion, from Dr. Gantz, without having had Dr. Gantz examine him, and caused Hoskins to fail to hire an attorney. The Code of Federal Regulations provides:

> Plans providing disability benefits. The claims procedures of a plan providing disability benefits will not, with respect to claims for such benefits, be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures comply with the requirements of paragraphs (h)(2)(ii) through (iv) and (h)(3)(i) through (v) of this section.

29 C.F.R. § 2560.503—1(h)(4) (labeled "Appeal of adverse benefit determinations.") Subsection (h)(3)(i) states that claimants must be provided with "at least 180 days following receipt of a notification of an adverse benefit determination within which to appeal the determination." 29 C.F.R. § 2560.503—1(h)(3)(i).

In this case, Hoskins was notified that he had 60 days to appeal. *See* R. at 275 ("Your written request for appeal must be filed with the Pension Committee, in care of Snap-On Incorporated, by registered mail within 60 days after receiving this letter."). The Plan's provision of the incorrect number of days to appeal is a procedural irregularity. *See*

25

29 C.F.R. § 2560.503—1(h)(3)(i); (h)(4).[6]  However, the Plan provided Hoskins with additional appeal and reconsideration opportunities, which Hoskins utilized.  Although Hoskins may have panicked in preparing his first appeal, he had approximately a year from the time of the November 8, 2005, letter denying benefits until the Plan's final reconsideration of his appeal on November 7, 2006.  The court fails to see how this procedural irregularity affected the Plan's ultimate decision to deny benefits.  *See Menz*, 520 F.3d at 869 (The irregularity "must have some connection to the substantive decision reached . . . .") (citing *Buttram*, 76 F.3d at 901).

Hoskins also claims that the Plan's failure to contact Dr. Gantz, review Hoskins's medical file, or consider Dr. Gantz's subsequent opinions—after his initial opinion that Hoskins was not disabled—constituted a procedural irregularity requiring a less deferential standard of review.  Hoskins does not cite any authority for the Plan's alleged duty to contact Dr. Gantz or request Hoskins's file.  Although Hoskins claims that failing to consider Dr. Gantz's subsequent opinions would be a procedural irregularity requiring *de novo* review—as the Plan appears to concede would be the case had it failed to consider Dr. Gantz's subsequent opinions—Hoskins's claim in this regard is not supported by the

---

[6]  The letter also states that the Plan would respond to the appeal within 60 days, *see* R. at 275 ("A decision on your appeal will generally be made within 60 days, and a written decision will be sent to you."), while the Code of Federal Regulations requires a response generally within 45 days. *See* 29 C.F.R. § 2560.503—1(i)(1)(i) (" . . . the plan administrator shall notify a claimant in accordance with paragraph (j) of this section of the plan's benefit determination on review within a reasonable period of time, but not later than 60 days after receipt of the claimant's request for review of the plan. . . ."); (i)(3)(i) (" . . . claims involving disability benefits (whether the plan provides for one or two appeals) shall be governed by paragraph (i)(1) of this section, except that a period of 45 days shall apply instead of 60 days for purposes of that paragraph."). However, Hoskins appealed the denial of benefits on November 19, 2005, and Prickett sent his response on December 13, 2005, which is a period shorter than 45 days.

record. Instead, the record reflects that Hoskins was given ample time to provide additional opinions from Dr. Gantz. In addition, the Plan alleges that they considered the opinions, and its analysis of Hoskins's appeal generally evidences its consideration of the subsequent opinions—whether the Plan's decision to deny benefits was reasonable, considering they reviewed all of Dr. Gantz's opinions, is another matter.

Lastly, Hoskins claims that the Plan's stated reasons for denying him benefits were inconsistent and outside the scope of the Plan documents. However, the stated reasons all generally allege that Hoskins is ineligible for disability retirement benefits because: (1) he applied at the improper time, or (2) he is not totally and permanently disabled. Regardless of whether the reasons were "reasonable," they were generally consistent.

The court finds that, although Hoskins has identified procedural irregularities, the connection between the irregularities and the substantive decision reached is not present. *See Menz*, 520 F.3d at 869 (citing *Buttram*, 76 F.3d at 901). Therefore, the court will apply an abuse of discretion standard of review. *See Manning*, 604 F.3d at 1038.

### 3.   *Entitlement to disability benefits*

#### a.   *Arguments of the parties*

*i.   Hoskins's initial arguments*. Hoskins claims that he is a disabled "member" under the Plan documents. First, Hoskins argues that, under the plain language of the Plan documents, section 2.4, he is a "member" of the Plan. Although the Plan has disputed whether Hoskins could apply for benefits after he was informed of his termination, he claims that what is at issue is whether he was employed until November 3, 2005. Hoskins claims that he was "employed by an employer" when he applied for benefits. Docket no. 22 (citing Plan Section 2.4). Hoskins also claims that he was being paid, receiving benefits, and subject to withholding for regular employment benefits until November 3,

2005. Similarly, Hoskins claims that Snap-On referred to November 3rd, in various ways—including "your last day of employment," "the end of your active employment," "the official employment termination date," "term date," "retirement date," "official retirement date," and "official termination/retirement date"—which allegedly signaled that he was employed until November 3rd. According to Hoskins, the Plan did not claim that his employment was terminated on October 19, 2005, before denying his application for disability benefits. Because Hoskins applied for disability retirement benefits on October 24, 2005, he argues that he was still employed at the time of the application.

Hoskins claims that, as a member under the Plan documents, he was also eligible for disability retirement benefits under Section 7.1, which provides the eligibility requirements for such benefits. Hoskins argues that there can be no dispute, based on the evidence provided to the Plan, that he is totally and permanently disabled. Although Dr. Gantz initially opined that Hoskins was not disabled, he argues that this was based on a review of only his past medical records and a hearing test. Hoskins alleges that, once Dr. Gantz examined him, he changed his opinion and found him to be totally and permanently disabled. Hoskins claims that the Plan improperly ignored Dr. Gantz's opinion that stated Hoskins was totally and permanently disabled, as is required for benefits under the Plan. Hoskins asks that this allegedly misplaced conclusion be overturned.

*ii.* ***The Plan's response***. The Plan claims that its denial of benefits was reasonable because it was supported by substantial evidence. This claim is based on the Plan's allegations that: 1) Dr. Gantz "never clearly opined that [Hoskins] met the Plan test as of October 20, 2005." Docket no. 25; and 2) Hoskins was working until his termination in October of 2005.

Concerning Dr. Gantz's opinions, the Plan claims that Prickett spelled out exactly what information was required to grant Hoskins benefits—on two occasions—which was

an opinion that Hoskins was totally and permanently disabled.  However, the Plan alleges that Dr. Gantz's opinions stopped short of providing an opinion concerning this standard.

The Plan also claims that Hoskins was not disabled because he worked up until his termination, and alleges that disability retirement benefits are typically intended to compensate an individual who lost his job because of his disability.  The Plan also claims that Section 7.1 "clearly implies" that Hoskins's departure from employment needed to be "because of a disabling condition that has lasted at least six months."  Docket no. 25.  The Plan references the *Finley*[7] five factor test, and refers to a case where the plaintiff filed his written application for benefits almost two years after being terminated, *see Klaver v. Cargill, Inc.*, 2002 WL 31960163 (N.D. Iowa 2002) (Jarvey, Mag.), but does not provide a discussion of the factors as applied to its asserted interpretation of the Plan documents.

*iii.*    ***Hoskins's reply***.  Hoskins claims that the Plan refused to consider additional evidence from Dr. Gantz, after his initial opinion that Hoskins was not disabled.  However, even if the Plan did consider Dr. Gantz's subsequent opinions, Hoskins argues that Dr. Gantz's initial report had some connection to the Plan's ultimate decision not to provide disability retirement benefits.  Hoskins also reiterates his claim that the Plan's reasons for denying him benefits were outside the scope of the Plan documents.  Hoskins further emphasizes his argument that he was still employed and continued to receive pay and benefits and to be subject to withholding for regular employment benefits until November 3, 2005.  Lastly, Hoskins argues that, if the Plan wanted to end Hoskins's employment on October 19, 2005, it could have immediately provided him with pay for his accrued vacation, rather than extending his last day of employment.

---

[7]    *See Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617, 621 (8th Cir.1992)

### b.   Analysis

The court found, above, that the Plan's decision to deny benefits should be reviewed under an abuse of discretion standard. "Under that standard, [the court] will not disturb the administrator's decision if it was reasonable." *Wakkinen v. UNUM Life Ins. Co. of America*, 531 F.3d 575, 583 (8th Cir. 2008). The court "measure[s] reasonableness by whether substantial evidence exists to support the decision, meaning 'more than a scintilla but less than a preponderance.'" *Id.* (citing *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1162 (8th Cir.1998) (rev'd on other grounds, *see e.g. Hackett v. Standard Ins. Co.*, 559 F.3d 825, 830 (2009)). When a plan administrator's interpretation of the relevant plan is at issue, the Eighth Circuit Court of Appeals has explained that courts should apply the following five factors to determine the reasonableness of the interpretation:

> (1) whether the administrator's language is contrary to the clear language of the plan; (2) whether the interpretation conflicts with the substantive or procedural requirements of ERISA; (3) whether the interpretation renders any language in the plan meaningless or internally inconsistent; (4) whether the interpretation is consistent with the goals of the plan; and (5) whether the administrator has consistently followed the interpretation.

*Darvell v. Life Ins. Co. of North America*, 597 F.3d 929, 935 (8th Cir. 2010) (citing *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617, 621 (8th Cir.1992)). "However, 'the dispositive principle remains . . . that where plan fiduciaries have offered a "reasonable interpretation" of disputed provisions, courts may not replace [it] with an interpretation of their own—and therefore cannot disturb as an "abuse of discretion" the challenged benefits determination.'" *Id.* (citing *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005)). The court "examine[s] only the evidence that was before the administrator when the decision was made, and we are to determine whether a

reasonable person could have—not would have—reached a similar decision." *Id.* (citing *Phillips-Foster v. UNUM Life Ins. Co.*, 302 F.3d 785, 794 (8th Cir.2002)).[8]

First, Hoskins claims that he is a member under the plan. Section 2.4 of the Plan states:

> 2.4 <u>Members.</u> A member is an "active member" of the SIRP plan component if he is employed by an employer (as defined in subsection 1.4) and is accruing benefits under the SIRP plan component (and not another component of the plan, as defined in subsection 1.3); provided, however, that a member shall be considered an active member of the SIRP plan component on the date on which such member terminates employment with all of the employers and subsidiaries. Any former member of the SIRP plan component who has accrued benefits (which have not been paid to, or for the benefit of, the member or transferred to another qualified plan or IRA) but who is no longer accruing benefits as an active member of the

---

[8] When evaluating whether a plan administrator's decision was reasonable, or an abuse of discretion, the court can also consider the existence of a conflict of interest:

> A conflict of interest exists when a plan administrator holds the dual role of evaluating and paying benefits claims, such as when the employer both determines eligibility for benefits and pays the benefits. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008). If such a conflict exists, then a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits. The significance of this factor depends on the circumstances of the particular case. *Id.* When an insurer has a history of biased claims administration, the conflict "may be given substantial weight."

*Manning*, 604 F.3d at 1038. However, Hoskins did not assert a conflict of interest in this case. *See* docket nos. 22 and 27; *see also* docket no. 25 ("Here, the plaintiff has not asserted a conflict of interest. . . .").

> SIRP plan component will be considered an "inactive member" whose accrued benefits will be paid in accordance with the provisions of the SIRP plan component in effect upon his termination of employment, retirement, or death, as the case may be. For all plan purposes, "member" and "members" shall refer to active members and to inactive members, collectively, except that where it is necessary to distinguish between them, as specific referral shall be made.

R. at 73-74.

The record contains Hoskins's termination letter, which states in part:

> This will confirm your termination from Snap-On . . . effective 10/19/2005, due to a reduction in force. Because you are at least age 50 and have ten or more years of service with Snap-On, this is also classified as a Retirement. Although your last workday is 10/19/2005, your 10.5 days of vacation extend your last day of employment to 11/3/2005.
> . . .
> As a terminating employee, all Life, Accidental Death and Dismemberment, Disability and Health Benefit, coverage's provided by Snap-on Incorporated will end on 11/3/2005.

R. at 1001-1002. Snap-On's letter unambiguously states that Hoskins's "last day of employment" was November 3, 2005. As part of this continued employment, Hoskins continued to be covered by "all Life, Accidental Death and Dismemberment, Disability and Health Benefit, coverage's provided by Snap-on Incorporated" until November 3, 2005. Insofar as the Plan argues that Hoskins was not an member under the Plan documents, active or inactive, under Section 2.4, the court finds that such an allegation is in conflict with Snap-On's termination letter, which unambiguously states that Hoskins was an employee and entitled to benefits as an employee until November 3, 2005. Although the Plan challenges the concept of an employee applying for disability retirement benefits after they have been informed of their termination, Section 2.4 covers employees without

regard to whether they are informed of their last day of employment prior to their request. The court recognizes, as Hoskins has, that Snap-On could immediately pay out sick leave, rather than extend an employee's last day of employment, if it does not want to provide benefits to its employees during that period.

The Plan also raises the issue of whether Hoskins's presence at work, up until October 19, 2005, precludes him from obtaining disability retirement benefits. Because Hoskins claims a disability date of October 27, 2005—the date of disability alleged by Dr. Gantz in his November 1, 2006, letter—his presence at work up until October 19, 2005, is not determinative, and this argument is not persuasive. Therefore, the court will turn to whether Hoskins is otherwise eligible for disability retirement benefits.

Subsection 7.1 states:

> 7.1 Eligibility. A member who, after completing ten or more years of continuous employment, becomes totally and permanently disabled by bodily injury or disease which prevents him from engaging in any occupation for remuneration profit, determined in the sole discretion of the committee ("disabled"), continues so disabled for six consecutive months and, in the opinion of the committee, is likely to remain so disabled for the balance of his life, will be retired and will receive a disability retirement income determined in accordance with subsection 7.4 and payable in accordance with subsection 7.5. . . .

R. at 97. Subsection 7.2 explains that the committee will require medical proof that the member was disabled under subsection 7.1. *Id.*

Before considering whether the Plan abused its discretion by finding Hoskins was not disabled under the Plan, the court will address the Plan's claim that there is a causation requirement in Section 7.1, *see* docket no. 25 ("The language in Section 7.1 clearly implies a departure from employment because of a disabling condition that has lasted at

least six months."). When considering the first *Finley* factor, the court does not find language in the Plan documents that is contrary to the Plan's interpretation of the causal requirement. *See Darvell*, 597 F.3d at 935 (citing *Finley*, 957 F.2d 621). The court also fails to see how the interpretation would conflict with the requirements of ERISA or render language in the Plan documents meaningless or inconsistent, under the second and third *Finley* factors. *See id.*

Under the fourth factor, however, the Plan's interpretation does conflict with the goals of the Plan, *see id.*, considering Snap-On's unambiguous position—stated in Hoskins's termination letter—that Hoskins was covered with disability benefits until November 03, 2005. Section 1.1, Article I, states:

> 1.1 Purpose, Effective Date. SNAP-ON INCORPORATED RETIREMENT PLAN has been established by SNAP-ON INCORPORATED (the "company") . . . to provide retirement incomes and other benefits for eligible employees of the company and its subsidiaries that adopt the plan. . . .

R. at 30. Snap-On's October 19, 2005, termination letter to Hoskins states: "As a terminating employee, all Life, Accidental Death and Dismemberment, Disability and Health Benefit, coverage's provided by Snap-on Incorporated will end on 11/3/2005." In the letter, Snap-On informs Hoskins that he will have disability benefit coverage until November 3, 2005. However, under the Plan's interpretation of the Plan documents—requiring an employee to leave employment because of a disability—Hoskins could not have possibly been entitled to disability retirement benefits during that period. This is because any disability occurring between October 19th and November 3rd would not have caused a departure from employment, as the RIF had already caused Hoskins's departure from employment. In other words, Snap-On recognized that Hoskins was eligible for disability benefits, and the Plan's interpretation of the Plan documents conflicts

with the Plan documents' goal "to provide retirement incomes and other benefits for eligible employees. . . ." R. at 30; *see also Darvell*, 597 F.3d at 935 (stating that the fourth *Finley* factor is "whether the interpretation is consistent with the goals of the plan") (citing *Finley*, 957 F.2d at 621).

Alternatively, Snap-On's previous claim that Hoskins was covered by disability benefits could be considered an implicit inconsistent interpretation of the Plan. Although the court is not provided with evidence concerning whether the Plan interpreted the Plan documents to require causation in the past, Snap-On implicitly did not require causation insofar as it stated, without limitation, that Hoskins was covered by disability benefits until November 3, 2005. *See* R. at 1002 ("As a terminating employee, all Life, Accidental Death and Dismemberment, Disability and Health Benefit, coverage's provided by Snap-on Incorporated will end on 11/3/2005."); *see also Darvell*, 597 F.3d at 935 (stating that the fifth *Finley* factor is "whether the administrator has consistently followed the interpretation") (citing *Finley*, 957 F.2d at 621).

In considering the *Finley* factors, the court finds that the Plan's claim that the Plan documents require a member's departure from employment "because of" the disabling condition, *see* docket no. 25 ("The language in Section 7.1 clearly implies a departure from employment because of a disabling condition that has lasted at least six months."), is not a "reasonable interpretation" of the disputed provision of the Plan and—to the extent Snap-On actually considered the asserted interpretation in denying benefits—it constitutes an abuse of discretion. *Darvell*, 597 F.3d at 935 ("'[T]he dispositive principle remains . . . that where plan fiduciaries have offered a "reasonable interpretation" of disputed provisions, courts may not replace [it] with an interpretation of their own—and therefore cannot disturb as an "abuse of discretion" the challenged benefits determination.'") (citing *King*, 414 F.3d at 999). It would seem that the fourth and fifth

*Finley* factors are especially significant in a case such as this: where an employee is specifically informed that they are covered by disability insurance during a certain time period—presumably alleviating the need to obtain additional or alternative insurance coverage—but later presented with an interpretation of the Plan documents that eliminates any possibility that they could have obtained coverage for a disability sustained during the period.

The Plan also found that Hoskins did not meet the eligibility requirements under Section 7.1, because Dr. Gantz allegedly failed to opine that Hoskins was totally and permanently disabled. Dr. Gantz opinions are summarized in the following table:

| Date | Opinion | Cite |
|------|---------|------|
| 10/25/2005 | Dr. Gantz check the "No" box, when answering: "Is patient now totally disabled." Dr. Gantz also stated that Hoskins was not restricted from performing any activities. Dr. Gantz assessed Hoskins's condition with the following comments: "Moderate to severe sensorineural hearing loss (AS). Profound deafness (AD). Hearing handicap is 52.6% on 10/28/05, which makes it difficult for him to hear in a noisy environment. His hearing might continue to deteriorate. | R. at 265 |

| 3/30/2006 | Dr. Gantz stated that he was treating Hoskins for a second tumor on the left side on his balance and hearing nerve and that his hearing was gradually getting worse. Dr. Gantz also stated: "Because of this tumor, Mr. Hoskins has difficulty with his balance and he should be disabled from his regular occupation, because of the danger of falling and losing his balance around equipment." However, Dr. Gantz opined that: "Hoskins's balance will most likely stabilize in the future, but we might have to remove the tumor on the left as it enlarges, because it is starting to press on the brainstem." Dr. Gantz also state: "I am sorry that you got the impression that this is not a permanent situation. It is a permanent condition and it is unlikely Mr. Hoskins will be able to return to work and I would claim that he is totally disabled and should have the ability to participate in his disability pension[']s benefit." Lastly, Dr. Gantz states, "I am hopeful that this letter will help to clarify Mr. Hoskins's unfortunate situation. It is unlikely that he will be employable, due to his disease and disorder. | R. at 1021 |

8/23/06     Dr. Gantz repeated his diagnosis of neurofibromatosis II and stated that Hoskins had, in 1979, "a translabyrinthine excision of a right acoustic neuroma." Dr. Gantz then stated:     R. at 1038

> This resulted in profound deafness on the right ear and loss of his balance nerve, because the tumor was involving the balance and hearing nerves. He has done well with his remaining tumor in his left ear until recently.
>
> ***
>
> In [March] 2005, he still had 88% word understanding in his left hear and a slowly growing tumor. We saw him again in March 2006 and he was having many more problems related to his tumor. He was having imbalance and unsteadiness and fluctuating hearing. When I wrote to Bridget Bord at Snap-on Incorporated on March 30, 2006, I said th[at] Mr. Hoskins was having more difficulty with his balance and should be disabled because of his balance problems; it had nothing to do with the hearing. In March 2005, his balance was not an issue.
>
> I hope this clarifies the situation and you will provide Mr. Hoskins with a permanent disability. Neurofibromatosis is an extremely devastating disease. It is unfortunate that he has this problem. However, at this point, he is unable to work because of loss of balance function in both ears.

| 11/1/06 | Dr. Gantz, first, recognizes that he stated on October 27, 2005, that Hoskins was not disabled.  Dr. Gantz, then explains: "However that was, I think, based on his hearing handicap, rather than his balance problems."  Dr. Gantz then states: | R. at 1052 |

> I would like to change my position on his disability back to October 27, 2005 and state that he was disabled, from a balance point of view, at that time.
>
> I hope this resolves this issue and I hope that Mr. Hoskins can obtain the disability that he is entitled.  It is an unfortunate situation that he had no control over. This is a disorder of unknown etiology, but it can be quite devastating and cause severe balance problems and bilateral deafness.  I am certain that eventually Mr. Hoskins will lose all the hearing in his only hearing ear and will require a brainstem implant for him to hear in the future.
>
> If I can be of other assistance, please contact me.

Section 7.1 of the Plan requires a member to be "totally and permanently disabled by bodily injury or disease which prevents him from engaging in any occupation for remuneration profit. . . .," in order to be considered "disabled."  R. at 97.  Prickett's January 5, 2007, letter—denying Hoskins benefits upon reconsideration of his appeal—recognized that Dr. Gantz found Hoskins totally and permanently disabled in his March 30, 2006, letter.  *See* R. at 1064 ("On March 30, 2006, Dr. Gantz sent a letter to the Company saying that you are totally and permanently disabled.").   In addition, Prickett's October 12, 2006, letter specifically asks for a formal retraction of Dr. Gantz's opinion and the date on which he opines Hoskins became disabled.  *See* R. at 1043.  Dr. Gantz's November 1, 2006, letter, directly responds to these inquiries by formally

retracting his previous opinion that Hoskins was not disabled and identifying the date of disability as October 27, 2005. *See* R. at 1052. However, as one of the two reasons for denying Hoskins benefits, Prickett writes:

> The information provided by Dr. Gantz in his letter of November 1, 2006 does not say that you were totally and permanently disabled as of October 28[9], 2005. While Dr. Gantz recants his original position that you were not disabled ("because of his hearing handicap"), his revised position that you were disabled, "from a balance point of view", does not clearly identify that you were totally and permanently disabled, as required by the Plan.

R. at 1064-5.

Having already stated that Hoskins was completely and totally disabled in his March 30, 2006, letter—as recognized in Prickett's January 5, 2007, letter—Dr. Gantz clarifies his opinion that Hoskins is disabled and specifies which day he, Dr. Gantz, considered Hoskins disabled. Although Dr. Gantz somewhat imprecisely states that the disability was "due to balance," the purpose of his letter was to specify the date on which Hoskins became disabled, which was responsive to Prickett's inquiries. R. at 1052 ("I would like to change my position on his disability back to October 27, 2005 and state that he was disabled, from a balance point of view, at that time.") There is no question that his reference to "at that time," was intended to mean October 27, 2005. Considering Dr. Gantz had already opined that Hoskins was totally and permanently disabled, his clarification of the date and repetition of the reason he changed his opinion—though his reasoning was less detailed in this letter than in previous letters—cannot reasonably be

---

[9] Dr. Gantz's letter actually provides a date of October 27, 2005, rather than October 28, 2005. *See* R. at 1052.

interpreted to consist of an opinion other than that of total and permanent disability as of October 27, 2005, when read in conjunction with the other letters.

The only medical source in the record, Dr. Gantz, opined that Hoskins was totally and permanently disabled as of October 27, 2005. The Eighth Circuit Court of Appeals has stated that, "[i]t is not an abuse of an ERISA plan administrator's discretion to ignore an opinion when the physician did not 'provide reliable objective evidence of testing or other proof to support the finding of long term disability.'" *Darvell v. Life Ins. Co. of North America*, 597 F.3d 929, 935 (8th Cir. 2010) (citing *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924-25 (8th Cir. 2004). However, Dr. Gantz had been treating Hoskins for decades, had surgically removed a tumor from his head, and had provided an undisputed diagnosis of Hoskins's condition along with reasons for his diagnosis in his medical records and through letters to Snap-On. The Plan also did not have an opinion from any other physician that had examined Hoskins, which contradicted Dr. Gantz's claim that Hoskins was totally and permanently disabled, as of October 27, 2005. Further, the Plan opted not to have Hoskins examined by any other physician. Although the Plan may have consulted with another medical source and simply failed to disclose those opinions, the Code of Federal Regulations requires that a plan's claims procedures: "Provide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination." 29 C.F.R. § 2560.503—1(h)(3)(iv); (h)(4) (applying subsection (h)(3) to claims concerning disability benefits).

The court finds that there is not substantial evidence in the record for the Plan's decision to find Hoskins was not entitled to disability retirement benefits under the Plan documents. *Wakkinen*, 531 F.3d at 583 (The court "measure[s] reasonableness by whether

substantial evidence exists to support the decision, meaning 'more than a scintilla but less than a preponderance.'") (citations omitted). The court finds that the Plan's decision to deny Hoskins disability retirement benefits was not supported by substantial evidence and, thus, the Plan abused its discretion. *See id.* Therefore, the court will order the Plan to provide Hoskins with disability retirement benefits pursuant to the Plan. The court's finding that Hoskins is entitled to disability benefits is not intended to interfere with the Plan's ability to require proof of Hoskins's continuing total and permanent disability under Section 7.3 of the Plan documents.[10]

### B. Failure to Provide Plan Documents

#### 1. Arguments of the parties

##### a. Hoskins's initial arguments

Hoskins's second claim is that the Plan should be penalized for its failure to provide Plan documents to his attorney, pursuant to 29 U.S.C. § 1132(c). Hoskins alleges that, through his attorney, he made repeated requests for Plan documents. Despite this request,

---

[10] Section 7.3 states:

> Recovery from Disability. At least once during each six-month period after the commencement of a disability retirement income, or more frequently if the committee so decides, the committee may require proof of a member's continuing total and permanent disability and, in its discretion, may require a medical examination at any reasonable time. If at any time prior to his normal retirement date the committee finds that the member is no longer disabled as provided in subsection 7.1 or if the member refuses to submit to a physical examination, his disability income will be discontinued.

R. at 97-8.

Hoskins claims to have not received any documents but only a voice mail stating that the Plan would not respond to his request, because he had exhausted his ERISA appeals process. The documents were provided approximately two years after his request, according to Hoskins, and he asks for the imposition of a civil penalty due to this delay.

### b.    The Plan's response

The Plan denies that Hoskins is entitled to relief and claims that he had already been provided with all of the information and documents. The Plan alleges that Hoskins was provided with the SPD at termination and that he had a copy of the Plan from the DOL. The Plan admits that Hoskins's counsel was treated discourteously but denies the treatment was a violation of § 1024(b)(4).

### c.    Hoskins's reply

Hoskins argues, in reply, that the Plan's allegation that it provided him with the SPD at his termination was not true. Rather, the only time Hoskins allegedly received a copy of the SPD, from Snap-On, was prior to his termination in connection with a change in the Plan documents.[11]

### 2.    Analysis

ERISA permits the court to impose a penalty for failure to provide Plan documents, as follows:

> (c) Administrator's refusal to supply requested information; penalty for failure to provide annual report in complete form
>
> (1) Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title, section

---

[11] The parties' Stipulation of Facts not in Dispute provides, however: "At the time of his termination of employment, Hoskins was provided with a copy of the [SPD] for the disability retirement plan." Docket no. 24.

1021(e)(1) of this title or section 1021(f), or section 1025(a) of this title with respect to a participant or beneficiary, or (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

29 U.S.C. § 1132(c)(1)(B) (emphasis added). ERISA also expressly provides that an administrator must comply with a written request for Plan documents, as follows:

(b) Publication of summary plan description and annual report to participants and beneficiaries of plan

Publication of the summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan as follows:

* * *

(4) The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a

> reasonable charge to cover the cost of furnishing such
> complete copies. The Secretary may by regulation prescribe
> the maximum amount which will constitute a reasonable charge
> under the preceding sentence.

29 U.S.C. § 1024(b)(4) (footnote omitted). A failure to comply with § 1024(b)(4) would trigger penalties pursuant to § 1132(c)(1)(B). Thus, to recover on a claim for a § 1132(c) penalty, for a failure to comply with § 1024(b)(4), the claimant must prove (1) that he or she requested the plan description in writing and (2) that the plan administrator failed to provide it. *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 948 (8th Cir. 1999). "The purpose of the penalty is to provide plan administrators with an incentive to timely respond to requests for documents." *Id.*

The Eighth Circuit Court of Appeals has explained the following, concerning the court's discretion in imposing statutory damages:

> The purpose of this statutory penalty is to provide plan
> administrators with an incentive to comply with the
> requirements of ERISA, *Kerr* [84 F.3d at 948], and to punish
> noncompliance, *Chesnut v. Montgomery*, 307 F.3d 698, 704
> (8th Cir.2002). In exercising its discretion to impose statutory
> damages, a court primarily should consider "the prejudice to
> the plaintiff and the nature of the plan administrator's
> conduct." *Kerr*, 184 F.3d at 948. Although relevant, a
> defendant's good faith and the absence of harm do not
> preclude the imposition of the § 1132(c)(1)(A) penalty.
> *Chesnut*, 307 F.3d at 703.

*Starr v. Metro Systems, Inc.*, 461 F.3d 1036, 1040 (8th Cir. 2006).

It is undisputed that Hoskins, through counsel, "made a demand for nine categories of documents including plan documents." Docket no. 24 (stipulation). "A follow up request was made on April 9, 2007." *Id.* "On April 27, 2007, Prickett left a voice mail for counsel refusing to respond based upon the fact that the appeals process had been

exhausted." *Id.* And, "Snap-On provided Hoskins a copy of the SP[D] and Plan document in the course of this litigation on April 9, 2009." *Id.*

These facts establish a claim under § 1132(c). Through counsel, Hoskins requested, on March 8, 2007, in writing, nine categories of documents, which included a request for "[a] copy of any updated [SPD] in effect between 2005 to the present," and "[a] copy of the plan description in effect between 2005 and the present." R. at 1073. The Plan claims that the request read like a Rule 34 Request for Production of Documents and that ERISA's obligation to provide documents is limited to "'formal documents that establish or govern the Plan.'" Docket no. 25 (citing *Brown v. American Life Holdings*, 190 F.3d 856, 861 (8th Cir. 1999)). The court does not fault the Plan for failing to provide a complete response to Hoskins's broad request for documents. Rather, the concern is that the Plan failed to provide any response to this request, which was in part a request for the SPD and Plan description. The Plan argues that Hoskins received the SPD directly from Snap-On and a copy of the Plan description from the DOL, approximately two years prior to the request at issue. However, even if Hoskins had possession of the SPD and, via the DOL, the Plan description—from two years prior—it is understandable to request the documents directly from the plan administrator, to ensure that they are complete and up-to-date. In addition, the plan administrator is able to "make a reasonable charge to cover the cost of furnishing such complete copies." 29 U.S.C. § 1024(b)(4). The Plan's failure to respond to the request is inexcusable.

The court, in exercising its discretion to impose statutory damages, will first look at the extent to which the plaintiff was prejudiced. *See Starr*, 461 F.3d at 1040. The Plan alleges that Hoskins was provided with all of the documents and, in support of this allegation, claims that the record consists entirely of documents originating from Hoskins

or sent to him. The record supports the Plan's claim that Hoskins was in possession of all of these documents.

The court also considers whether the Plan was acting in good faith—the Plan may have a claim that it was acting in good faith by not responding to the request, for example, because it resembled a request for discovery and was sent by Hoskins's attorney. The court should consider the plan administrator's conduct, *see id.* (citing *Kerr*, 184 F.3d at 948), and, specifically, the plan administrator's good faith. *See id.* (citing *Chesnut*, 307 F.3d at 703). Not only did the Plan fail to respond to Hoskins's requests for Plan documents, its eventual response was simply that it was refusing to respond because the appeals process had been exhausted. The Plan also argues against the possibility that it did not provide the documents in good faith by stating: "Counsel may have been treated discourteously, but that does not create a violation of § 1024(b)(4)." Docket no. 25.

Hoskins has established a violation of § 1132(c), beginning on April 9, 2007, or 30 days after his request for Plan documents on March 8, 2007. The Plan provided Hoskins with the SPD and Plan documents in the course of litigation on April 9, 2009, or approximately 730 days later—a rate of $110 [12] per day would yield an award of $80,300 (730 days times $110). The Plan has argued that their actions were discourteous but have not argued that they were a result of a good faith mistake. The court, in finding that the Plan's actions were discourteous, not in good faith, capable of prejudicing Hoskins and delaying resolution of the dispute, and a violation of § 1132(c)(1)(B), will assess the Plan a penalty in this case. However, the court will not order a penalty in the full amount but,

---

[12]     The daily penalty has been increased at least once, to $110, by DOL regulations. *See Christensen v. Qwest Pension Plan*, 462 F.3d 913, 919 & n.3 (8th Cir. 2006) (citing Final Rule Relating To Adjustment of Civil Monetary Penalties, 68 Fed. Reg. 2875-76 (Jan. 22, 2003)). The parties have not cited any subsequent adjustment.

instead, exercises its discretion to order a penalty of $25 a day, rather than $110 a day. This leaves considerable room for the imposition of a greater daily penalty for more egregious violations. The Plan will be assessed a penalty of $18,250—or 730 days multiplied by $25 per day.

### III.  CONCLUSION

THEREFORE, the court reverses Defendant Snap-On Incorporated Retirement Plan's decision to deny Plaintiff Dean Hoskins disability retirement income and orders the defendant to award Hoskins disability retirement income pursuant to the Plan documents, from April 27, 2006.[13]  The defendant is also assessed a penalty of $18,250.00 for failing to timely provide Plan documents.

**IT IS SO ORDERED.**

**DATED** this 20th day of July, 2010.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA

---

[13]  A member found to be disabled is not entitled to disability retirement income, under the Plan documents, until he or she has been disabled for six consecutive months. *See* R. at 97 (Section 7.1 of the Plan documents states that a member who is found to be disabled, and who continues to be "disabled for six consecutive months and, in the opinion of the committee, is likely to remain so disabled for the balance of his life, will be retired and will receive a disability retirement income. . . .").